**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DIAMOND RESORTS U.S. COLLECTION
DEVELOPMENT, LLC, and DIAMOND RESORTS
HAWAII COLLECTION DEVELOPMENT, LLC,

      Plaintiffs,

vs.                             Case No.: _____

HAROLD O. MILLER, HAROLD O.
MILLER ATTORNEY, LLC, JOHN E.
MORTIMER, d/b/a MIDDLE EARTH SALES
AND SERVICE, MIDDLE EARTH, LTD., LLC
f/k/a MIDDLE EARTH, LTD., SMFD, LTD.,
WILLIAM S. SALIBA,
FRANK D. SILVA, FREEDOM
CONSUMER SERVICES, LLC, d/b/a
TIMESHARE FREEDOM GROUP *and*
TIMESHARE FREEDOM; SYSTEMA
MARKETING, INC., JORDAN SALKIN,
SHAYNA G. SCHROEDER, MOLFETTA
LAW, LLC, and MICHAEL A. MOLFETTA,

      Defendants.
_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Diamond Resorts U.S. Collection Development, LLC and Diamond Resorts

Hawaii Collection Development, LLC (collectively, "Diamond" or "Plaintiffs"), sue Defendants

Harold O. Miller ("Miller"), Harold O. Miller Attorney, LLC ("Miller Law"), John E. Mortimer

("Mortimer"), d/b/a Middle Earth Sales and Service; Middle Earth, Ltd., LLC f/k/a Middle Earth,

Ltd. ("Middle Earth"); SMFD, Ltd. ("SMFD"); William S. Saliba ("Saliba"); Frank D. Silva

("Silva"); Freedom Consumer Services, LLC, d/b/a Timeshare Freedom Group and  Timeshare

Freedom ("Timeshare Freedom Group"); Systema Marketing, Inc. ("Systema"); Jordan Salkin

("Salkin"); Shayna G. Schroeder ("Schroeder"); Molfetta Law, LLC ("Molfetta Law"); and Michael A. Molfetta ("Molfetta") (collectively, "Defendants"), and states:

## **INTRODUCTION**

1.     Plaintiffs market, sell, and finance the sale of vacation membership interests (also known as timeshare interests) in the Diamond Resorts U.S. Collection and the Diamond Resorts Hawaii Collection.  Defendants are engaged in an unlawful enterprise that targets and aims to breach Plaintiffs' valid and enforceable timeshare contracts with their customers through false advertising, tortious interference, unfair and deceptive trade practices, and civil conspiracy. Defendants falsely advertise and market, through at least two different consumer-facing timeshare exit businesses, a timeshare cancellation service which falsely promises timeshare owners to "get [them] completely out of [their] timeshare contract – legally and permanently."

2.     Timeshare owners pay thousands of dollars in advance paid fees to sign up for Defendants' illusory timeshare cancellation service, which they are told is "simple," "perfected," has a 100% success rate, and is "guaranteed" to release them from their timeshare interests for any or no reason whatsoever, without any investigation of whether there is a legitimate basis for any such release.

3.     What really underlies Defendants' so-called "freedom process" is institutionalized tortious interference: an instruction to timeshare owners to breach their timeshare contracts and cease making payments to timeshare developers such as Diamond.  The resulting default of the purchase money loan and other contractual obligations will, Defendants hope, then result in foreclosure or forfeiture of the timeshare interest.  When Defendants cause this breach, they knowingly subject their customers to adverse and potentially ruinous credit reporting and tax liability.  None of this is ever disclosed to timeshare owners.  But, if Defendants are ever

challenged by an irate adversely affected customer, Defendants spin the developer's foreclosure or forfeiture of the timeshare interest, with which, other than the tortious interference precipitating it, Defendants played no part, as a successful result and the promised "guaranteed" cancellation. Never mind that timeshare owners can obtain the same default and foreclosure result on their own, without having to pay Defendants thousands of dollars for a faux  "legal process" that consists of nothing more than a generic letter to a timeshare developer vaguely requesting a response "to resolve this matter."

4.     Defendants thus have no process at all, and certainly not one "guaranteed" to result in contract cancellation.  Despite the falsehood, Defendants use the internet, radio, television, social media, and other sources to aggressively pitch their false statements and empty promises. Defendants' advertisements, marketing, and sales presentations for their alleged "services" utilize numerous deceptive and unfair trade practices in soliciting customers and throughout the process of providing the supposed "services."  These include statements guaranteeing contract cancellation regardless of whether there is a basis for any such guarantee, assuring customers that no further payments on the underlying contracts will be required, promising the ease of the "exit" process and relating to processes to repair negative credit consequences from Defendants' services.  In addition, Defendants boldly call their timeshare exit services a "legal" solution, a deception furthered by the use of lawyers and "law firms" to falsely suggest an active involvement of a licensed attorney who has familiarity with timeshare law.

5.     Defendants also instruct their customers not to communicate with their timeshare companies and falsely advise the timeshare companies that their customers are represented by counsel and thus all communications must be directed through Defendants.  This practice allows Defendants to manipulate the flow of information to their customers and hides the fact that nothing

is being done to accomplish their timeshare "exits" or "cancellations."

6.      A key part of Defendants' unfair and deceptive advertisement and sales practices involves statements instructing or suggesting that timeshare owners should default on their valid and legally enforceable contractual obligations to Plaintiffs, thus intentionally causing damage to the timeshare companies and attempting to create unlawful leverage for a timeshare contract cancellation.

7.      Defendants' false and deceptive advertising practices have already subjected them to multiple lawsuits from various timeshare developers, some of which have resulted in permanent injunction being entered against several of the Defendants here, prohibiting them from soliciting or advertising to certain timeshare owners, from inducing them to stop paying their loans or fees, or from referring them to exit companies.

8.      The Defendants and their roles in the timeshare exit scheme, briefly stated, are as follows:

        a.      Mortimer is the beneficial owner and the primary person in control of the domain names "thetimeshareexitattorneys.com" and "cancel123.com," including their content. The latter website forwards the browser to the website for a timeshare exit company called "The Timeshare Exit Attorneys" (the two websites are, collectively, "the TEA Websites").  Mortimer operates the business(es) that advertise or advertised through the TEA Websites.  While the "Privacy Policy" for the website located at "timeshareexitattorneys.com" claimed that the website is operated by "Timeshare Exit Attorneys, a Nevada limited liability company," no such company appears in the Nevada Secretary of State's records.  Mortimer owns Defendant Middle Earth and, upon information and belief, is at least a part owner of Defendant SMFD and Solomon Cross. Mortimer, one of the guiding spirits and key operators of Defendants' scheme, is in charge of

multiple timeshare exit businesses that advertise to timeshare owners.  Mortimer also handles "referrals" to the "law firms" that are used to create the false appearance of a "legal process" whereby lawyers perform substantive work, when in fact the work is done by non-lawyers, such as Mortimer himself and under his direction.

b.      Timeshare Freedom Group is a Nevada limited liability company that purports to provide timeshare cancellation services and is owned by Salkin, operated by Schroeder on her own initiative and at Salkin's direction. Timeshare Freedom Group is linked to Mortimer, Miller, Molfetta, and their respective companies, which share in the proceeds and split fees from Timeshare Freedom Group's false and misleading advertising for serving as the lawyers purportedly involved in the promoted "legal" cancellation "process."

c.      Systema is a Nevada corporation that markets and purports to provide timeshare cancellation services and is owned by Salkin, operated by Schroeder on her own initiative and at Salkin's direction. Systema is linked to Mortimer, Miller, Molfetta, and their respective companies, which share in the proceeds and split fees from Systema's false and misleading advertising for serving as the lawyers purportedly involved in the promoted "legal" cancellation "process."

d.      Salkin is the owner of Timeshare Freedom Group and Systema and is the beneficial owner and person in control of the domain name "timesharefreedomgroup.com," which hosts the website for Timeshare Freedom Group.  Salkin directs and controls Timeshare Freedom Group and Systema.  He replaced Miller's law firm with Molfetta and his law firm as the false legal "front" for Defendants' scheme.  Salkin, an associate of Alex Jones, the media personality and conspiracy theorist, was convicted of attempted murder of his girlfriend and is currently awaiting retrial in Orange County, California.  Salkin has also been charged with threatening to

kill another girlfriend and her nine-year old son.  Molfetta represents Salkin as his criminal defense attorney in both cases.

e.      Schroeder runs the day-to-day operations of Timeshare Freedom Group and Systema at Salkin's direction and on her own initiative, and thus exercises day-to-day control of those entities and a substantial part of Defendants' marketing and trade practices, making her a key figure in Defendants' scheme as well.

f.      Middle Earth was originally a Nevada limited liability company named Middle Earth, Ltd. However, following the filing of a lawsuit by a different timeshare developer against Mortimer and others, it was dissolved and then domesticated in Wyoming as Middle Earth, Ltd., LLC in March 2020.  Middle Earth is linked to Mortimer, who also does business as "Middle Earth Sales and Service."  Through Mortimer, Middle Earth receives ill-gotten gains from Defendants' scheme and also funnels funds from the scheme to SMFD.

g.      SMFD is a Nevada limited liability company controlled and owned by Mortimer, which receives ill-gotten games from Defendants' scheme through Middle Earth;

h.      Saliba is an attorney and member of The Florida Bar, who was the sole officer (President, Vice President, Secretary, and Treasurer) of Solomon Cross, a Florida corporation with a principal place of business in Lake Worth, Florida until it was dissolved by Saliba in January 2020.  Although Solomon Cross was not a law firm, it presented itself as one in communications with timeshare developers on behalf of timeshare owners referred to it through Defendants' scheme.  All the initial written communications from Solomon Cross to Plaintiffs were in Saliba's name and bore his signature.  Solomon Cross received referrals from Mortimer, Timeshare Freedom Group, Systema, and potentially others in the scheme, and is believed to have been controlled and partly owned by Mortimer.  In conjunction with Mortimer and Silva, Saliba

controlled and/or directed the content published and displayed on the TEA Websites.

i.      Silva has significant experience in the illicit timeshare exit industry.  He introduced Mortimer, Miller, and Saliba to Salkin, Schroeder, Timeshare Freedom Group, and Systema.  In conjunction with Mortimer and Saliba, Silva controlled and/or directed the content published and displayed on the TEA Websites.  Silva also actively engages in the operation of the scheme by supervising and working with Mortimer's offices and, upon information and belief, with other timeshare exit companies that receive referrals originating from Defendants' scheme.

j.      Miller is an attorney and member of The Florida Bar, who runs Miller Law as a solo practitioner.  Miller received referrals of timeshare owner customers who signed up with Mortimer, Timeshare Freedom Group, and Systema, and either prepared and sent perfunctory letters of representation to timeshare companies or allowed his name and signature to be used for such letters.  He received payment from Timeshare Freedom Group and Systema, with directions to forward part of the funds to Mortimer;

k.      Molfetta is a criminal defense attorney in California who, along with Molfetta Law, the law firm he owns and operates as a solo practitioner, has essentially taken Miller's place in the scheme, by either preparing and sending perfunctory letters of representation to timeshare companies (often for customers of Defendants' scheme that Miller previously claimed to represent) or allowing his name and signature to be used for such letters.  As noted above, Molfetta represents Salkin in his attempted murder trial in Orange County, California.

9.      Defendants solicit customers through a multitude of advertisements that misrepresent the nature of their services.  These advertisements are distributed through, without limitation, Defendants' websites, social media pages, television advertising, radio advertising, and online advertising (such as on YouTube).

10. Defendants falsely and misleadingly advertise that they provide a legal service to permanently cancel a timeshare contract, and that this alleged timeshare cancellation service has been "perfected" and is "simple and guaranteed"[1]:



11. However, this advertising is false and misleading as Defendants' "timeshare cancellation service" provides no legal means of cancellation.  Defendants' services are instead designed to cause timeshare owners, including those who purchased vacation membership interests from Diamond, to stop fulfilling their lawful contractual payment obligations, without any legal justification, resulting in breach, default, foreclosure, and damaged credit, which Defendants then offer to repair.

---

[1] https://web.archive.org/web/20190602061008/http://thetimeshareexitattorneys.com.  The quoted language and the graphic appearing below were on the "The Timeshare Exit Attorneys" website for years.

12.     In order to solicit timeshare owners, Defendants' online advertisements and website content create a false narrative that Defendants' "timeshare cancellation service" is equivalent to legal representation or that Defendants are operating a law firm with a "team of lawyers," when they are not.  In many of their advertisements Defendants state that they are "run by real attorneys, not sales companies or middlemen. It was a salesperson who got you into this mess, don't rely on a salesperson to get you out."[2]  The described advertisement is false and/or misleading because the businesses are not run by lawyers and do not have a team of lawyers.  Far from it, Miller and Miller Law had virtually nothing to do with the communications being sent in their names, and the same is believed to be the case with their successors, Molfetta and Molfetta Law.  Solomon Cross has never been a law firm, despite pretending to be one.

13.     All the while, Defendants have no legal or permanent cancellation service, know that none exists, perform virtually no work for the thousands of dollars in up-front fees they charge for their made up services, conduct no investigation to determine if there are any legal grounds for "cancellation" of a customer's timeshare interest, and instead cause timeshare owners to breach their contractual obligations with Diamond, injuring both Diamond (which is not being paid as required under promissory notes) and the timeshare owners (by taking thousands of dollars based on false and misleading representations and subjecting them to foreclosure and the attendant negative consequences).  Defendants' practices generally consist of doing literally nothing to assist the timeshare owners other than, in some instances, sending a letter requesting a response "to resolve to this matter" and then waiting for termination/foreclosure proceedings.

14.     Defendants do not tell their customers, but they know that default and foreclosure

---

[2] See television commercial, https://www.ispot.tv/ad/wG8V/the-timeshare-exitattorneys-its-not-your-fault, at approximately 0:40 mark.

is the only way the customers' contracts with Plaintiffs will actually be cancelled.  Without inducing non-payment—that is, without causing timeshare owners to breach their contracts with Plaintiffs—Defendants cannot deliver on their hollow promises.  Most of the "exits" Defendants have claimed to accomplish amount to nothing more than involuntary terminations of timeshare purchase contracts due to timeshare owners' nonpayment.  Defendants know that their "processes"—including their advertisements,  marketing statements,  sales pitches, and/or statements and instructions given to timeshare owners—will cause the timeshare owners to breach legally enforceable contractual obligations to timeshare developers, including Diamond, without any cause or justification.

15.     Defendants' use of false and misleading advertising and deceptive and unfair trade practices, individually and in combination, plays a material and substantial part in inducing timeshare owners to breach existing contracts and cease doing business with Diamond. Defendants' unlawful conduct includes, but is not limited to:

      (a)  falsely conveying to the public that they can get customers out of their timeshares without even investigating whether there is any legitimate reason to do so;

      (b)  falsely conveying that they can do this "legally;"

      (c)  guaranteeing an "exit";

      (d)  persuading customers to pay large up-front fees for "exit" services instead of paying Plaintiffs;

      (e)  persuading customers to stop paying Plaintiffs as part of their process or otherwise;

      (f)  preventing communications between Plaintiffs and their customers to conceal from Plaintiffs who is involved in the "exit" process and from their customers that no work is actually being done;

      (g)  utilizing unfair, deceptive, and unlawful methods to obtain cancellations;

      (h)  offering and engaging in credit repair services in violation of applicable laws; and

(i) falsely characterizing cancellation as a success even if it results in default and resultant foreclosure.

16. Defendants' misconduct gives rise to numerous violations of law, including false advertising claims under the Lanham Act, claims for tortious interference, numerous violations of Florida Deceptive and Unfair Trade Practices Act, and conspiracy. Plaintiffs bring this action to enjoin Defendants' violations of law, and to recover the damages Defendants' misconduct has caused Plaintiffs.

## THE PARTIES

17. Plaintiff Diamond Resorts U.S. Collection Development, LLC is a Delaware limited liability company with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.

18. Plaintiff Diamond Resorts Hawaii Collection Development, LLC is a Delaware limited liability company with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.

19. Miller is an individual and resident of the State of Florida who resides in Sarasota, Florida. He is an attorney and a member of The Florida Bar.

20. Miller Law was a limited liability company organized and existing under the laws of the State of Florida. Miller Law was administratively dissolved on September 28, 2018 for failure to file an annual report. Miller Law's address is 5531 Cannes Circle, Apartment 201, Sarasota, Florida 34231.

21. Mortimer is an individual residing in the State of California with an address of 43980 Mahlon Vail Road, #806, Temecula, California.

22. Middle Earth is a limited liability company, first named Middle Earth, Ltd., and dissolved in Nevada, which was domesticated in Wyoming in March 2020 and renamed

Middle Earth, Ltd. LLC. Middle Earth is owned and operated by Mortimer. Middle Earth's address is 1309 Coffeen Avenue, Suite 2500, Sheridan, Wyoming 82801.

23.     SMFD is a limited liability company organized under the laws of the State of Nevada.  In the Nevada Secretary of State's records, SMFD's manager is listed as Arcanus Management Corp., which is the manager of both Middle Earth (an entity linked to Mortimer) and Timeshare Freedom Group (an entity linked to Salkin).[3]

24.     Saliba is an individual and resident of the State of Florida who resides in Orlando, Florida.  He is an attorney and a member of The Florida Bar.

25.     Silva is an individual and resident of the State of Florida who resides in Venice, Florida.

26.     Timeshare Freedom Group is a limited liability company organized under the laws of the State of Nevada.  No principal place of business is registered with the Nevada Secretary of State.  Timeshare Freedom Group, however, lists various locations on its website, purporting to have a principal address located at 23046 Avenida De La Carlota Suite 600, Laguna Hills, CA 92653, although the company is not registered with the California Secretary of State.  Timeshare Freedom Group lists P.O. Box 4470, Stateline, Nevada, an address associated with Systema in the Nevada Secretary of State's records, as its address on wire transfers.  Moreover, Timeshare Freedom Group purports to have a regional office at 4000 Hollywood Blvd., Suite 555-S, Hollywood, FL 33021.  Upon information and belief, Salkin is the owner of Timeshare Freedom Group.

27.     Systema is a corporation organized under the laws of the State of Nevada, with an

---

[3] Arcanus Management Corp. is a notorious front company registered in Panama which is reported as being commonly used to conceal corporate ownership.

address of P.O. Box 4470, Stateline, Nevada. Upon information and belief, it operates as a sister shell company interchangeably with Timeshare Freedom Group. Systema registered "Freedom Consumer Services," which is the name of the entity that does business as Timeshare Freedom Group.

28.     Salkin is an individual and resident of the State of California who resides in Newport Beach, California. Salkin is the owner of Timeshare Freedom Group and its domain name, as well as Systema. Salkin is one of the masterminds of Defendants' scheme and directs and manages the affairs of Timeshare Freedom Group and Systema directly and indirectly through his staff and subordinate officers, such as Schroder.

29.     Schroeder is an individual and resident of the State of California who, upon information and belief, resides in Costa Mesa, California. Schroeder is the President, Secretary, Treasurer, and Director of Systema. Upon information and belief, Schroeder is personally involved in and runs and manages the day-to-day operations of Timeshare Freedom Group and Systema, both under Salkin's direction and on her own decision-making power.

30.     Molfetta is an individual and resident of the State of California who resides in Dana Point, California. Molfetta is an attorney and a member of the State Bar of California.

31.     Molfetta Law is a limited liability company organized under the laws of the State of California and its principal place of business is at 15795 Rockfield Boulevard, Ste. A, Irvine, California 92618.

## JURISDICTION & VENUE

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because a federal question is presented under the Lanham Act, 15 U.S.C. § 1125(a). Furthermore, this Court has supplemental subject matter jurisdiction over the state law claims

pursuant to 28 U.S.C. § 1367(a) as the state law claims are so related to clams in this action within the Court's original jurisdiction that they form part of the same case or controversy.

33.     This Court may exercise personal jurisdiction over Defendants because they are subject to general jurisdiction in the State of Florida.  Miller and Saliba are attorneys licensed to practice law in the State of Florida, and Miller Law is a citizen of the State of Florida.  Silva is a resident of the State of Florida.  Timeshare Freedom Group have been operating its business at least in part through an office in Florida.  Miller, Miller Law, and Solomon Cross—through Mortimer, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, and Schroeder—have been advertising to customers and clients located in Florida.  They promise cancellation of Florida timeshare interests for contracts signed in Florida, which has the largest concentration of timeshare interests in the United States.  They also direct communications into the State of Florida relating to supposed timeshare cancellation for timeshare resorts and timeshare developers located in Florida.  All Defendants have conspired with Miller, and Miller Law or with Molfetta and Molfetta Law, who took Miller's place in the conspiracy.  Saliba, Silva, Mortimer, Timeshare Freedom Group, Systema, Salkin, and Schroeder advertise and solicit on behalf of Miller and Miller Law, and now Molfetta and Molfetta Law, by directing communications to timeshare owners in Florida, directing unsolicited mail to Florida, and conducting sales presentations and meetings with prospective customers in Florida.

34.     In addition, Defendants' internet-based operations subject them to general personal jurisdiction in the state of Florida.  Defendants do not operate a passive advertising website; rather Defendants do business over the internet by entering into contracts with residents of Florida through their websites, which involves the repeated transmission of computer files over the internet and allows Florida residents to exchange their contact information with a host computer.

Defendants operate numerous websites, including, without limitation, "thetimeshareexitattorneys.com," "cancel123.com," and "timesharefreedomgroup.com," to solicit consumers.

35.     Moreover, because all Defendants are engaged in a conspiracy, the jurisdictional contacts with the State of Florida by the commission of a tortious act in furtherance of their conspiracy are properly imputed to the other Defendants.  As certain of the Defendants—Miller, and Miller Law—are residents of the State of Florida, and Timeshare Freedom Group conducts its business at least in part through an office located in Florida, their acts and their jurisdictional contacts with Florida, standing alone, are sufficient to establish personal jurisdiction over the other Defendants because these jurisdictional contacts apply to them as well.

36.     The Court's exercise of personal jurisdiction over Defendants will not violate traditional notions of fair play and substantial justice.

37.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial part of Defendants' conduct giving rise to the claims occurred in, was directed to, and/or caused harm to Diamond in this District.  Furthermore, four of the Defendants—Miller, Miller Law, Saliba, and Silva—are residents of and maintain business operations in the District.

38.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## GENERAL FACTUAL ALLEGATIONS

### Diamond Resorts

39.     Diamond Resorts International, Inc. ("DRI") is one of the largest hospitality

companies in the world with more than 420 branded and affiliated resorts and over 27,000 guest beds in 35 countries and destinations throughout the continental United States and Hawaii, Canada, Mexico, the Caribbean, Europe, Asia, Australia, and Africa.  DRI and its subsidiaries develop, own, operate, and manage vacation membership resorts.

40.     Plaintiffs are indirect subsidiaries of DRI that offer multistate vacation memberships that allow members to acquire vacation ownership interests in the form of points, which they can then use to stay at various destinations within the network assembled into various "Collections," or to book airline tickets, hotel accommodations, cruises, excursions, or other activities.  Plaintiff Diamond Resorts U.S. Collection Development, LLC has created the created the Diamond Resorts U.S. Collection (the "U.S. Collection"), which consists of nearly 50 resorts in Arizona, California, Colorado, Florida, Indiana, Missouri, Nevada, New Mexico, South Carolina, Tennessee, Virginia, and St. Maarten.  Plaintiff Diamond Resorts Hawaii Collection Development, LLC has created the Diamond Resorts Hawaii Collection (the "Hawaii Collection") which consists of resorts in Hawaii, Nevada, California, and Arizona.

41.     Plaintiffs, for example, offer an ultra-flexible points-based program for vacationing at a variety of destinations, primarily throughout the United States.  Members can select from more than 40 different resorts in places like Orlando, Lake Tahoe, Sedona, Hilton Head, Las Vegas, and other destinations.  In addition, membership provides members with access to 110 resorts (through the Collections or Diamond's sister companies), and through Diamond's internal exchange program, hundreds of additional affiliated resorts and hotels, and dozens of cruise itineraries.

42.     These vacation membership interests allow the customers to use hundreds of vacation destination properties throughout the world.  At the time a customer purchases a timeshare interest from Plaintiffs, the customer executes a Purchase and Security Agreement (the "Purchase

Agreement") wherein the customer agrees, among other things, to pay a certain price for the timeshare interest.

43.     If a purchaser desires financing from Diamond, he or she may complete and submit a credit application. If approved for financing, a purchaser will execute and deliver a Promissory Note (the "Promissory Note") in connection with the timeshare purchase.  Diamond is the lender on the Promissory Note and the beneficiary under the security interest created in each of the Purchase Agreements with the Diamond Owners.  Each of the individuals identified in Exhibit A purchased a timeshare interest from Diamond, which Diamond financed.   The identified individuals comprise the "Diamond Owners."

44.     For those timeshare owners who need to leave their vacation ownership behind, Diamond has instituted the Transitions™ program, which offers members and owners a respectful way to relinquish all or part of their vacation ownership, providing them with the opportunity to transition out of vacation ownership.   Defendants hijack this transition process and induce timeshare owners to breach their agreements with Diamond through an unlawful scheme described below.

***The Defendants' Unlawful Scheme***

45.     Defendants falsely and misleadingly advertise a "guaranteed" ability to "terminate" or "cancel" timeshare contracts, including the Purchase Agreements and Promissory Notes, on behalf of consumers, including the Diamond Owners.  Defendants, however, possess no such ability and they know they possess no such ability.

46.     Defendants take large, up-front fees from consumers and then do little or nothing on their behalf other than directing the consumer to stop making payments to their timeshare developers, eventually causing the consumer to default on their timeshare obligations, resulting in

foreclosure and substantial harm to the consumer and the timeshare developer.

47.     Defendants' scheme comprises two main components: the marketing arm which engages in false and misleading advertising to lure the unsuspecting timeshare owners into Defendants' scheme, and the "law firms" who are used to give the false impression that licensed attorneys are involved in the cancellation "process," falsely and misleadingly suggesting a basis in law to Defendants' promoted services.

***The Marketing Defendants***

48.     Mortimer, through his TEA Websites (and through his companies Middle Earth and SMFD); Saliba; Silva; Timeshare Freedom Group; its sister shell company Systema; Salkin, who owns and controls both Timeshare Freedom Group and Systema; and Schroeder, who operates both Timeshare Freedom Group and Systema, constitute the marketing arm of Defendants' scheme (the "Marketing Defendants").

49.     The Marketing Defendants have been operating through a variety of means, including, without limitation:

> a.     a webpage for Timeshare Freedom Group hosted at the domain "timesharefreedomgroup.com" (*see* Exhibit B);
>
> b.     other websites associated with Timeshare Freedom Group including Timeshare Freedom Group's Facebook and Twitter pages;
>
> c.     two websites—"thetimeshareexitattorneys.com" and "cancel123.com" —which appear to be temporarily disabled, but in the past have been owned by Mortimer and controlled by Mortimer, Saliba, and Silva, and which Plaintiffs have reasons to believe will be operational again in the near future (*see* Exhibit C);
>
> d.     social media advertisements or profiles, such as on Instagram and on Facebook at https://www.facebook.com/timeshareexitattorneys/;
>
> e.     television advertisements, copies of which can be viewed at https://www.ispot.tv/ad/wG8V/the-timeshare-exit-attorneys-its-notyour-fault   and   https://www.ispot.tv/ad/nACI/timeshare-freedom-group-

          freedom-process-we-can-help;

f.      a YouTube video which can be viewed at https://www.youtube.com/watch?time_continue=1&v=Rl0XvD4ufiQ;

g.      a radio ad, a copy of which can be heard at https://www.truthinadvertising.org/wp-content/uploads/2020/04/Timeshare-Freedom-Group.mp3; and

h.      additional as yet unknown means.

50.    The Marketing Defendants have engaged in false and/or misleading advertising through the channels set forth above, which are placed into interstate commerce. Specific false and/or misleading advertisements that these Defendants have placed into interstate commerce are set forth above, and are further detailed below.

51.    Once a Diamond Owner falls for the Marketing Defendants' false and/or misleading advertising, they enter into a contract for the provision of the Marketing Defendants' fraudulent and illusory services. The Diamond Owner is generally charged extraordinary amounts of money—in the thousands or sometimes even tens of thousands of dollars—which money is split amongst the various Defendants.

52.    During this process, the Diamond Owner is instructed by Defendants to cease making payments under their Promissory Notes to Diamond and they are told that "an attorney" will be working on "the file."

53.    There is no legitimate basis for instructing Diamond Owners to cease making payments to Plaintiffs. The instruction or suggestion to stop making payments is made to cause the Diamond Owners to default, which Defendants hope will precipitate a foreclosure. In that event, Defendants will tell the Diamond Owners that they were "successful" in "cancelling" their timeshare contract, when, in reality, the vacation membership interest was foreclosed upon, a result any Diamond Owner could have obtained for free by simply refusing to make payments as they

came due.

54.     Defendants' direction or suggestion to the Diamond Owners to cease making payments to Diamond redirects the payments from Diamond into Defendants' pockets. Defendants justify their exorbitant fees by telling Diamond Owners that they are saving money by not having to pay Diamond during the purportedly "perfected," "legal," and guaranteed cancellation process.  Thus, Defendants utilize the false and/or misleading advertisements to divert funds and payments from Diamond to Defendants.

55.     Defendants also instruct the Diamond Owners to have no contact with Diamond, falsely stating that this is needed to facilitate the "exit" process.  In reality, Defendants instruct Diamond Owners to have no contact with Diamond to prevent the Diamond Owners from learning the truth about the status of their accounts (*i.e.*, that they are going into foreclosure) and how little Defendants are doing on their behalf in exchange for the thousands of dollars they were paid.

***The "Law Firms"***

56.     Once a Diamond Owner signed a contract with the Marketing Defendants to obtain the promised timeshare cancellation services, the Marketing Defendants each utilized and "referred" their customers to a designated "law firm" such as Miller Law, its successor Molfetta Law, and now-dissolved Solomon Cross, which was not actually a law firm.

57.     A list of Diamond Owners that Miller and Miller Law claimed to represent is attached hereto as Exhibit D.

58.     A list of Diamond Owners that Solomon Cross claimed to represent is attached hereto as Exhibit E.

59.     A list of Diamond Owners that Molfetta and Molfetta Law claimed to represent— several of whom Miller and Miller previously claimed to represent—is attached hereto as Exhibit

F.

60.     The "law firms"— Miller Law, Solomon Cross, Molfetta Law, and potentially others not yet traced to the Marketing Defendants—are and/or were an integral part of Defendants' scheme, without which the scheme could not function.   Because the Marketing Defendants' marketing and advertisements refer to "legal" solutions, they need a law firm—or, in the case of Solomon Cross, a company that appeared to be a law firm—to maintain the illusion that they are performing a legal function and that their vaunted cancellation process is legally valid and based in the law.

61.     As can be discerned from Miller's letterhead and the information posted on the "The Timeshare Exit Attorneys" Facebook page, Miller and Miller Law share a telephone number with the timeshare exit service advertised and marketed on the TEA Websites owned and run by Mortimer, that is, "The Timeshare Exit Attorneys":

## HAROLD O. MILLER, ESQ

ATTORNEY-AT-LAW

(Also Licensed in Virginia and Washington, D.C.)

Physical Address:
  5531 Cannes Circle
  Suite 201
  Sarasota Florida 34231
  Office: 877-224-8009

Fax: (941)924-3531

E-Mail: harold@haroldomillerattorney.com

August 28, 2019



62.     Therefore, it is clear that Miller and Miller Law were connected with the Marketing Defendants and that the Marketing Defendants are at least one of the sources of Miller and Miller Law's "clients," a number of whom are Diamond Owners.

63.     The Marketing Defendants supply more than duped customers to the scheme.  The paperwork that was used presumably for the so-called "clients" of Miller and Miller Law, and likely the other "law firms," was prepared for intake by Timeshare Freedom Group, and provided to Mortimer.  Mortimer thus served as one of the main points of contact and a key figure in Defendants' scheme, funneling documents and information from the Marketing Defendants that

they compiled as the direct point of contact with customers for use by (or, more accurately, in the name of) "law firms" such as Miller and Miller Law.  Miller described Mortimer as "the architect of how this business relationship worked with these timeshare owners."  (Exhibit G at 128:1-4).

64.     Moreover, Mortimer has admitted that he had access to Miller's email address and telephone number.  (*See* Exhibit H at 3).  The telephone number for Miller's law practice rang not in his office in Sarasota, Florida, but in the offices of Mortimer and Silva—neither of whom is an attorney—in Springfield, Missouri.  Similarly, Mortimer used Miller's email address to communicate with timeshare owners who thought they were communicating with an attorney, and Mortimer and Silva and their staff prepared and sent out the "letters of representation" in Miller's name to the timeshare developers.  (*See id.*).  Even written correspondence from a "client" that was sent to Miller Law in Sarasota, Florida would be forwarded by FedEx to Mortimer in Springfield, Missouri for him and his and Silva's staff—not Miller—to handle.  Miller was simply a front man with a law license whom Mortimer used solely because of the scheme's need for the perceived value of the involvement of a law firm.

65.     Similarly, Saliba and Solomon Cross share or shared the same address as Mortimer's "Timeshare Exit Attorneys" outfit that was part of this scheme:

**Do you need a consultation, have a question or comment?**

Solomon Cross
1065 Morse Blvd, Suite 101
Winter Park,
Florida 32789

🌐 www.solomoncross.com
*tel:* (407) 629-7673
*fax:* (407) 386-6563

66.     Therefore, it is clear that Solomon Cross was connected with the Marketing Defendants and that the Marketing Defendants were at least some of the sources of Saliba's and Solomon Cross's "clients," which include Diamond Owners.

67.     At the direction of Salkin and Schroeder, Systema wired funds generated from Defendants' sales to the "law firms" such as Miller Law, in order to keep the scheme funded and running.  Miller then split those proceeds three ways among him, Mortimer, and Silva.  The funds directed to Mortimer were wired to him monthly via a bank account held in the name of Middle Earth.

68.     In or about January 2020, Diamond began to receive letters from Molfetta Law similar to those that it had already been receiving from Miller, Miller Law, Saliba, and Solomon Cross. Many of these letters concerned supposed "clients" of Miller that suddenly and without explanation had become "clients" of Molfetta.  Timeshare Freedom Group continues to refer existing and new timeshare owner customers to Molfetta and Molfetta Law.  Molfetta is personally

known to Salkin because he represents him in two criminal cases in Orange County, California.

69.     Upon information and belief, Salkin and Mortimer replaced Miller with Molfetta as one of the lawyers involved in the scheme.  Molfetta thus serves the same role in the conspiracy as Miller did.

70.     Molfetta Law is a solo practice devoted primarily to criminal defense, which is run by Molfetta.  Molfetta Law lists six practice areas on its website, none of which involve timeshares. These are "White Collar Crimes:  State and Federal," "Murder and Manslaughter," "Other Violent Crimes," "Narcotics Related Offenses:  State and Federal," "Sex Offenses," and "Drug Offenses".

71.     The Marketing Defendants also use their designated "law firms" to isolate  the Diamond Owners from Diamond in order to prevent  the Diamond Owners from discovering the truth about their timeshare "exit" cases.  Saliba, Solomon Cross, Miller, Miller Law, Molfetta, and Molfetta Law refer to Diamond Owners as "clients" and have directed Diamond to contact only Saliba, Solomon Cross, Miller Law, and/or Molfetta Law (depending on the letter sent), and not the Diamond Owners they "represent."  Thus, Diamond is unable to communicate directly with its own customers, the Diamond Owners, who have been instructed not to communicate with Diamond, effectively preventing the Diamond Owners from learning the truth about how little is being done by Defendants on their behalf or that they face the likely unwelcome—and therefore hidden—prospect of foreclosure appearing on their credit reports.

72.     Saliba, Solomon Cross, Miller, Miller Law, Molfetta, and Molfetta Law give no legal advice and provide no legal services and do not actually create attorney-client relationships with the Diamond Owners.  Indeed, Timeshare Freedom Group's advertisements make clear that Timeshare Freedom Group serves as a "single point of contact" for its customers, consistent with the fact that Saliba, Miller, Miller Law, Molfetta, and Molfetta Law do not typically speak directly

to their supposed "clients."  (*See* Exhibit I).

73.     Representative samples of the letters created by or at the direction of Mortimer and Silva, and sent under the name and signature of Miller, are attached hereto as Composite Exhibit J.

74.     Representative samples of the letters sent by Solomon Cross are attached hereto as Composite Exhibit K.

75.     Representative samples of the letters sent by Molfetta and Molfetta Law are attached hereto as Composite Exhibit L.

***Defendants' False and Misleading Advertising***

76.     Defendants' advertising contains a multitude of false and misleading representations, some of which are discussed above.

77.     The website of Timeshare Freedom Group contains the following false and misleading advertising:

a.     The false and incomplete description of its "process" on the home page of the timesharefreedomgroup.com website:



The above advertisement is false and misleading because it conceals from timeshare owner customers that Timeshare Freedom Group's actual method or "process" for obtaining a "timeshare cancellation" is to cause a breach of payment obligations, create a default, isolate the customer from their timeshare developer so that the customer cannot be informed of the actual "process," and wait for a foreclosure, which, if it takes place, will result in serious and significant adverse financial consequences for the customer. The falsity of this advertising is compounded because no-one should be made to pay Defendants' (or anyone else's) exorbitant fees for these things to occur.

           b.      Promising to cancel timeshare obligations "legally and permanently," on the home page of the timesharefreedomgroup.com website.

> Our team of timeshare cancellation attorneys and advisors will get you completely out of your timeshare contract – legally and permanently. We pride ourselves on excellent service, making the process of cancelling your timeshare contract easy and painless.  Get Out of Your Timeshare Contract for good!

> Every month, Timeshare Freedom Group helps timeshare owners like yourself eliminate their unwanted, costly timeshares, legally and permanently. No matter your situation, we will fight to get you out of your timeshare contract and to eliminate those maintenance fees forever.  Click the link below or call us at 866-668-6872 to schedule a free consultation.

Timeshare Freedom Group, however, does not have any "legal" process to "eliminate" timeshares — just an unlawful breach to cause a default and hope for a foreclosure.  Moreover, its advertisement of attorneys' services is false and misleading because the "law firms" that it utilizes, as described throughout herein, are part of an unlawful scheme that is dependent on subjecting timeshare owners to foreclosure by causing them to default on their payment obligations and then do little more than send a perfunctory letter without any investigation of the customer's circumstances to determine if there is a legal basis to seek cancellation of their timeshare obligations.  A breach does not "legally" or "permanently" free or release Diamond Owners from

their obligations with Diamond, but instead triggers the non-defaulting party's (*i.e.,* Diamond's) rights to pursue its contractual remedies.  And since Defendants never utilize a legal process to cancel or exit a timeshare contract, their exit strategy frequently results in foreclosures of timeshares, which damages Diamond Owners' credit.  Because Defendants instruct, recommend, induce, or otherwise persuade Diamond Owners into defaulting on their contractual obligations to Diamond, including Promissory Notes, Defendants cannot truthfully advertise that the resulting termination is in any way "legal."  To do so misleads the public.

78.     Timeshare Freedom Group has also placed numerous television and radio advertisements that contain the same false and misleading representations of a "freedom process" that, it claims, will result in the cancellation of timeshare interests "legally and permanently."  *See* https://www.ispot.tv/ad/nACI/timeshare-freedom-group-freedom-process-we-can-help, at approximately 0:24 and 0:37.   Another ad, as reflected in the screenshot below, promises "GUARANTEED TIMESHARE RELEASE," (https://www.facebook.com/171052080294058/ videos/402724470530690/, at approximately 0:12).  Both ads also appear on Timeshare Freedom Group's Facebook profile.  For the reasons set forth above, these advertisements and promotions are false and misleading statements of the nature of Defendants' "services."



79.     The above-described false and misleading advertisings and promotions materially misrepresent Defendants' services and have the capacity to deceive, and indeed have deceived, the consuming public, including Diamond Owners.

80.     The TEA websites, run and controlled by Mortimer, Saliba, and Silva that presently appear to be temporarily disabled, contained the following false and misleading advertising, which is typical and representative of the deceptive advertising in which Defendants have engaged in the past and Plaintiffs believe will engage again in the future:

        a.     The "client testimonials" or "Success Stories" carousel throughout the thetimeshareexitattorneys.com website:



These advertisements are false and/or misleading because they are entirely fabricated.  The "testimonials" are not from real individuals, and the photographs of these individuals are "stock photos" taken from companies such as shutterfly.com.  Fake consumer reviews are legally considered to be false and/or misleading advertising;

> b.    The "100% Service guarantee" on the Frequently Asked Questions ("FAQ") page of the thetimeshareexitattorneys.com website:

## Home much does your service cost?

Fees are contingent on your timeshare, current status of ownership and a few other factors. Some situations are more complex than others and require a higher fee. After you receive a consultation, you'll receive a firm quote.

Of course we back our work by a 100% Service guarantee. If we do not do exactly what we say we will do, you will receive a full refund of your fee.

But there is no "100% Service guarantee." Defendants do nothing other than cause a default of payment obligations and submit a generic letter with a boilerplate request for a response "to resolve this matter."  They hope for a foreclosure and consider such a result to satisfy their obligations to consumers, but conceal that fact from prospective customers, so Defendants do not "do exactly what we say we will do."  Defendants cannot truthfully advertise a "guaranteed" termination, release, or rescission of any timeshare contract, because that would require the agreement of the

other party to the contract, namely Diamond, yet Diamond has never authorized Defendants to "guarantee" any lawful termination, release, or rescission regarding anything.  To the extent a Diamond Owner's breach or default of a timeshare contract and resulting foreclosure of that interest "guarantees" its termination, such result does not owe to any service or commercial activity by the Defendants. To the contrary, a Diamond Owner can breach his or her contract without any involvement by Defendants.  Therefore, the fact that Defendants charge exorbitant fees to persuade a Diamond Owner to breach their Promissory Note makes evident the scam they perpetuate.

      c.     The "100% success rate" on the same FAQ page:

## What is your overall success rate?

We are 100% successful because our attorneys take the time to assess your individual situation and allow you to choose options we know we can deliver instead of "selling you" on an option that won't work for you. That is why we offer a solution for every scenario. Every timeshare ownership is unique. So is each solution.

Defendants cannot be "100% successful" and are not "100% successful."  Even if a foreclosure is considered a "success," which no reasonable person would, the Diamond Owners' timeshare interests have not been foreclosed upon.  Nor do Defendants have a variety of "options" they present or a consumer can chose that Defendants "know we can deliver."  To the contrary, Defendants conceal that the one-size-fits-all option they always put into action for every customer is a contract breach, which results in default and an eventual foreclosure.

      d.     "We negotiate directly with your timeshare company to exit you from your timeshare entirely," on the same FAQ page:

## Do you sell my timeshare in order to release me from my ownership with the timeshare company?

We work with individuals who want to get out of their timeshare completely. We negotiate directly with your timeshare company to exit you from your timeshare entirely.

Defendants do not "negotiate directly with [a] timeshare company."  They generally send a single

letter with a meek request of a "response to resolve this matter," and do nothing further, which can hardly be considered a "negotiation."

e.    The "resort offer guarantee" on http://thetimeshareexitattorneys.com/our-process/:

We have a 100% service guarantee. We do what we say we will do, and we guarantee the resort will make you an offer to end your timeshare obligation.

As explained above, there is no "100% Service guarantee." And Defendants know that they cannot guarantee that "the resort will make you an offer to end your timeshare obligation," especially when they do little more than send a perfunctory letter and hope and wait for a foreclosure on a defaulted timeshare account, which no reasonable consumer would consider to be an offer or even the services being advertised by Defendants. Defendants cannot truthfully advertise a "guaranteed" offer from a customer's timeshare resort or developer to "end [the] timeshare obligation" because that would require an agreement of the timeshare resort or developer to always respond to Defendants with such an offer, yet Diamond has no such agreement or understanding with Defendants and have never authorized the Defendants to "guarantee" that Diamond would make such an offer to Defendants' customers.

f.    A "Legal Process" that "mak[es] [timeshare companies] take the timeshare back," on the same webpage:

## 3. Legal Process

We make getting out of a timeshare as easy as possible. Our team fights the timeshare company on your behalf, making them take the timeshare back. Our attorneys pursue a legally binding result so that your timeshare cancellation is permanent.

Defendants cannot "mak[e]" a timeshare developer "take the timeshare back," especially when they have and utilize no "legal process." Defendants falsely equate (i) the termination of a timeshare obligation through breach, default, and/or foreclosure (the actual result of their "exit

services") with (ii) a "legal" result. A breach does not "legally or "permanently" free or release a Diamond Owner from their obligations with Diamond, but instead triggers the non-defaulting party's (Diamond's) rights to pursue its contractual remedies. A contract is never cancelled or "exited." To the contrary, it is fully enforced, including, without limitation, termination thereof and damage to the Diamond Owner's credit. Because Defendants instruct, recommend, induce, or persuade Diamond Owners into defaulting on their contractual obligations to Diamond, including Promissory Notes, Defendants cannot truthfully advertise that the resulting termination is in any way "legal." To do so misleads the public.

***Defendants Compete for the Diamond Owners' Payments***

81.     Once a Diamond Owner enters into an agreement with the Marketing Defendants, the sole purpose of that agreement is to cause that Diamond Owner to withdraw his or her business from Diamond, effectively converting that individual from a Diamond Owner into a customer of the Defendants.

82.     Because Solomon Cross, Miller Law, and Molfetta Law are the entities through which services advertised by the Marketing Defendants have actually been provided (as set forth in more detail throughout the Complaint), Solomon Cross, Miller Law, and Molfetta Law— through Saliba, Silva and Mortimer; Miller; and Molfetta, respectively—have also been acting as direct competitors to Diamond as, without them, the Marketing Defendants' business would not function.

***Defendants' Actions Have Damaged Diamond***

83.     To date, Defendants' misconduct has caused the Diamond Owners to retain Defendants and to divert business and monies from Diamond to Defendants. As a result of Defendants' misconduct—including Defendants' advertisements and solicitations, sales

presentations, express or implied instructions, and false and deceptive practices—the Diamond Owners have stopped making payments owed to Diamond pursuant to legally-enforceable contracts.

84. Defendants' misconduct has proximately caused Diamond's damages for Defendants' own pecuniary benefit.

85. All conditions precedent to the filing of this action have been satisfied, waived, or have occurred.

86. Diamond has retained the law firm of Greenspoon Marder LLP to represent it in this action and is obligated to pay reasonable attorneys' fees and costs incurred herein. Diamond seeks recovery of its reasonable and necessary attorneys' fees and costs from Defendants.

## COUNT I

**FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. §1125(A)(1)**
(against Mortimer, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, and Schroeder)

87. Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 86 above as if more fully set forth herein.

88. This is a cause of action against Mortimer, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, and Schroeder for unfair competition through false advertising under the Lanham Act, 15 U.S.C. § 1125(a), and is within this Court's jurisdiction.

89. Section 43(a) of the Lanham Act provides a cause of action for unfair competition through false advertising.

90. Diamond is engaged in commerce within the control of Congress because it has cognizable commercial interests in its Purchase Agreements and Promissory Notes, which fall within the zone of interest protected by 15 U.S.C. § 1125(a).

91. The purported timeshare cancellation services advertised and promoted by

Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema are offered in interstate commerce, and their related false and misleading advertisements travel in interstate commerce.

92.     As outlined above, Salkin and Schroeder direct and control Timeshare Freedom and Systema and manage their day-to-day operations, and thus are necessarily involved in the marketing decisions of these primarily marketing entities, marketing an illusory and falsely advertised timeshare cancellation service.

93.     Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema willfully and deliberately make materially false or misleading advertisements in interstate commerce—on their websites and in television, radio, and Internet advertising, and likely other advertising and marketing channels—including but not limited to:[4]

(a) Stating or suggesting that Plaintiffs' customers may cancel their timeshare interest without any legal basis;

(b) Stating that they have a legal process to cancel contracts with Plaintiffs legally;

(c) Stating that they have a 100% success rate;

(d) Stating that they negotiate directly with the timeshare company;

(e) Guaranteeing that the timeshare company will make Defendants an offer to end the timeshare obligation;

(f) Misrepresenting that they have legal or other relevant skills and experience to cancel contracts with Plaintiffs;

(g) Misrepresenting that they will perform a service, when they have no intention of doing so, and may instead rely on inaction and/or foreclosure;

(h) Guaranteeing the ability to cancel contracts with Plaintiffs when they cannot do so using legitimate legal methods or without detriment to customer;

(i) Guaranteeing cancellation or release of timeshare interests and obligations;

---

[4]   This enumeration is not intended to be exhaustive and additional false and misleading statements for which Plaintiffs will seek relief herein are expected to be identified by continuing investigation and through discovery.

(j)  Falsely instructing or suggesting that default is a required part of the "exit" process;

(k)  Misrepresenting that the supposed legal process to cancel contracts with Plaintiffs is not default and cancellation; and

(l)  Misrepresenting that they can or will repair any negative consequences of default.

94.    The statements of Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema, outlined in part above and throughout this Complaint, are not only literally false, but also misleading when considered in their full context.

95.    The statements of Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema, outlined in part above, deceived or had the capacity to deceive consumers.

96.    The statements of Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema, outlined in part above, had a material effect on consumers' purchasing decisions.

97.    Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema purposefully inserted themselves into the same marketplace in which Plaintiffs operate – the timeshare industry consisting of existing timeshare owners.  Mortimer's, Saliba's, Silva's, Timeshare Freedom Group's, and Systema's false advertising is directed to Plaintiffs' existing customer base, the same market to which Plaintiffs provide their products and services and to which they market.

98.    Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema advertise to Plaintiffs' existing customer base in order to persuade them to do business with Mortimer, Saliba, Silva (through the TEA Websites), Timeshare Freedom Group, and Systema and their affiliated companies instead of Diamond, and to divert monies to Mortimer, Timeshare Freedom Group, and Systema and their affiliated companies instead of paying legally-enforceable obligations due and owing to Diamond.

99.    Accordingly, Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema are

in direct competition with Diamond.

100.    Mortimer's, Saliba's, Silva's, Timeshare Freedom Group's, and Systema's false and misleading advertisements injured Diamond's commercial interests, specifically the lost sales through the Diamond Owners' non-payment on Promissory Notes.

101.    The actions of Mortimer, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, and Schroeder have been willful and make this case exceptional under 15 U.S.C. § 1117(a).

102.    By this action, Plaintiffs seek the following relief:

(a) Injunctive Relief, including:

   i.   Enjoining Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from engaging in false and misleading advertising, and from engaging in the specific false and misleading advertising identified above;

  ii.   Requiring Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema to remove from the public domain, wherever possible, and to destroy, all such false, misleading, and deceptive materials;

 iii.   Requiring Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema to file with this Court and serve on Plaintiffs within fifteen days after entry of an injunction, a report, in writing and under oath, setting forth in detail the manner and form in which they have complied with the injunction; and

  iv.   Requiring Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema to provide notice of such injunction by posting the Order on the

websites they use or control and any websites which refer to and/or link to the websites they use or control.

(b) Judgment against Mortimer, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, and Schroeder for damages, including:

    i.   Statutorily allowed monetary damages arising from unpaid and due promissory note obligations and balances on the Diamond Owners' accounts with Plaintiffs;

    ii.   Treble damages (*see* 15 U.S.C. § 1117(a));

    iii.   Disgorgement of Mortimer's, Saliba's, Silva's, Timeshare Freedom Group's, Systema's, Salkin's, and Schroeder's profits (*see* 15 U.S.C. § 1117(a)); and

    iv.   Costs of suit, expenses, and attorneys' fee incurred in this action.

## COUNT II

**CONTRIBUTORY FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)**
(against Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law)

103.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 86 above as if more fully set forth herein.

104.    This is a cause of action for contributory violation for false advertising under the Lanham Act, 15 U.S.C. § 1125(a) against Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law, and is within this Court's jurisdiction.

105.    As set forth above, Mortimer, Saliba, Silva, Timeshare Freedom Group, and Systema (the latter two directed and controlled by Salkin and Schroeder) engaged in false advertising under the Lanham Act that injured Plaintiffs.

106.    Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law contributed to Mortimer's, Silva's, Saliba's, Timeshare Freedom Group's, and Systema's false advertising by knowingly inducing, contributing to, or causing said false advertising, and/or by materially participating in their false advertising and reaping the benefits therefrom.

107.    Miller, Miller Law, Saliba, Molfetta, and Molfetta Law explicitly or implicitly encourage the false and/or misleading advertising because they permit the Marketing Defendants to falsely and misleadingly advertise a "legal process" for timeshare cancellation.  By virtue of the Marketing Defendants' false advertising of a "legal process," their subsequent referral of customers and sharing of revenues from Diamond Owners to Miller, Miller Law, Saliba, Solomon Cross[5], Molfetta, and Molfetta Law for the advertised "legal" process, Miller, Miller Law, Saliba, Solomon Cross, Molfetta, and Molfetta Law materially participated in the Marketing Defendants' false advertising.  In fact, Miller, Miller Law, Saliba, Solomon Cross, Molfetta, and Molfetta Law were necessary and integral to the Marketing Defendants' false advertisements and, at a minimum, enabled the Marketing Defendants to engage in false advertising.

108.    Systema, Salkin, and Schroeder explicitly or implicitly encourage the false and/or misleading advertising because Systema and Timeshare Freedom Group are operating as sister shell companies, interchangeable with one another under the common ownership and control of Salkin.  Schroeder runs and manages the day-to-day of Systema's and Timeshare Freedom Group's operations, both at Salkin's direction and under her own decision-making power.  As Salkin and Timeshare Freedom Group commit the false advertising, Systema and Schroeder are aware of it

---

[5]    Solomon Cross was formerly an integral participant in Defendants' scheme. It was dissolved in January 2020 and so is not made a party to this action. Its complicity, though, is not extinguished.

and encourage it and materially participate in it by continuing to fund and benefit from the scheme.

109.   Middle Earth and SMFD explicitly or implicitly encourage the false and/or misleading advertising by financially benefitting from the Marketing Defendants' false and misleading advertisements.  Middle Earth and SMFD receive revenues that pass through the scheme, both from Mortimer's TEA Websites and from Timeshare Freedom Group, and Systema. Mortimer causes revenues from the TEA Websites to be transferred to Middle Earth and a portion of those revenues are passed on to SMFD.  Similarly, revenues from Timeshare Freedom Group and Systema are passed through to Miller and Miller Law and, upon information and belief, Molfetta and Molfetta Law, with instructions to remit a portion to Mortimer.  Mortimer then causes those funds to be placed with Middle Earth and a portion of those revenues are passed on to SMFD as well.  As the Marketing Defendants commit the false advertising, Middle Earth and SMFD are aware of it and encourage it and materially participate in it by continuing to facilitate the money flowing to fund and benefit from the scheme.

110.   The revenues generated by Miller, Miller Law, Middle Earth, SMFD, Saliba, Solomon Cross, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law from Diamond Owners are derived entirely or substantially through the Diamond Owners' reliance on the Marketing Defendants' false and misleading advertising.

111.   Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law explicitly or implicitly encourage the false and/or misleading advertising.

112.   Miller's, Miller Law's, Middle Earth's, SMFD's, Saliba, Systema's, Salkin's, Schroeder's, Molfetta's, and Molfetta Law's actions have been willful and make this case exceptional under 15 U.S.C. § 1117(a).

113.   By this action, Plaintiffs seek the following relief:

(a) Injunctive Relief, including:

    i.  Enjoining Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from accepting referrals from persons or entities that engage in false or misleading advertising relating to any legal process or legal services to be provided by Miller, Miller Law, Molfetta, or Molfetta Law; and

    ii.  Requiring Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law to provide notice of such injunction by posting the Order on the websites they use or control and any websites which refer to and/or link to the websites they use or control.

(b) Judgment against Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law for monetary damages, including:

    i.  Statutorily allowed monetary damages arising from unpaid and due promissory note obligations and balances on the Diamond Owners' accounts with Plaintiffs;

    ii.  Treble damages (*see* 15 U.S.C. § 1117(a));

    iii.  Profits of Miller, Miller Law, Middle Earth, SMFD, Saliba, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law (*see* 15 U.S.C. § 1117(a)); and

iv.   Costs of suit, expenses, and attorneys' fee incurred in this action.

## COUNT III
## TORTIOUS INTERFERENCE

114.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 86 above as if more fully set forth herein.

115.    This is a cause of action for tortious interference with contractual relationships against all Defendants, and is within the Court's supplemental and jurisdiction.

116.    Plaintiffs have valid and legally enforceable contracts (the Purchase Agreements and Promissory Notes) with each of the Diamond Owners (Exhibit A) for their timeshare interests.

117.    The Defendants generally had knowledge of Plaintiffs' relationships with the Diamond Owners.  In fact, the only reason Defendants sought to establish a relationship with the Diamond Owners was because Plaintiffs had a business and contractual relationship with the Diamond Owners.

118.    Defendants sought to capitalize on Plaintiffs' contractual relationships with the Diamond Owners.  As set forth above, Defendants used false advertising and deceptive and unfair practices to solicit the Diamond Owners, to convince the Diamond Owners that they should seek to cancel their contracts with Plaintiffs, to convince the Diamond Owners that Defendants had a "legal process" to cancel the contracts, and to convince the Diamond Owners to pay Defendants' fees for this supposed "legal process."

119.    Defendants, knowing they could not deliver any contract cancellation, and certainly not any "legal process" of contract cancellation, instead sought to induce the Diamond Owners to stop paying their legally-enforceable, contractual obligations to Plaintiffs.  Defendants' hope was that, if the Diamond Owners stopped paying their obligations to Plaintiffs, they would be in default and Plaintiffs would voluntarily cancel their contracts or foreclose on the timeshare interest that

secures the indebtedness reflected in the Diamond Owner's Promissory Note. That is the only (undisclosed) way Defendants' supposed "legal process" works.

120.    Defendants induced the Diamond Owners to stop making payments to Plaintiffs— that is, breach their contracts with Plaintiffs—in several ways, including but not limited to (individually and in combination), false statements, misrepresentations, affirmative statements and/or omissions in Defendants' advertising, solicitation, and sales presentations; conduct; express instructions to stop making payments; suggestions to stop making payments to Plaintiffs; and suggestions that the Diamond Owners' limited funds be used to pay Defendants' fees, instead of paying their obligations to Plaintiffs. Defendants even presented the issue of non-payment to the Diamond Owners as "legal advice," despite no attorney performing any investigation into the Diamond Owner's circumstances, determining whether any legitimate basis existed for non-payment, or evaluating or discussing the risks of non-payment with the Diamond Owner.

121.    Defendants' acts and omissions, individually and in combination, were intended to convey to the Diamond Owners that no reason was needed to cancel their contracts with Plaintiffs; Defendants had a "legal process" to cancel the contracts; Defendants were experts in timeshare cancellation; the "process" was "perfected," "simple," "guaranteed"; there was no downside; and payments to Plaintiffs were not required.

122.    Each Diamond Owner stopped paying Plaintiffs as a result of Defendants' actions.

123.    Defendants' willful and intentional actions to induce the Diamond Owners to breach their agreements with Plaintiffs constitute intentional interference with existing contracts.

124.    Defendants had no justification or privilege to interfere.

125.    Defendants' actions were not in good faith, but rather were made with the knowledge and purpose to enrich themselves by harming Plaintiffs, with reckless disregard for the

attendant consequences naturally, directly, and proximately resulting from Defendants' actions.

126.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages arising from unpaid and due promissory note obligations and balances for the Diamond Owners, who are identified in Exhibit A.

127.    Defendants are actively and continuously operating in this manner, attempting to—and in some cases succeeding in—interfering with Plaintiffs' contracts and business relationships. Defendants' actions present an immediate threat of harm to Plaintiffs, Plaintiffs' customers and their relationships.  Plaintiffs will also suffer irreparable harm from the destruction of the relationships with their customers caused by Defendants' actions, for which there is no adequate remedy.  Thus, injunctive relief is warranted to enjoin Defendants' actions as described herein.

128.    There would be no legitimate harm to Defendants from entry of the requested injunction, as they would merely be enjoined from performing unlawful acts.  The issuance of the requested injunction would also serve the public interest by protecting consumers from Defendants' unlawful conduct and by protecting Plaintiffs' legitimate business interests.

129.    By this action, Plaintiffs seeks the following relief:

(a) Injunctive Relief, including:

  i.  Enjoining Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from tortiously interfering with Plaintiffs' contracts;

  ii.  Enjoining Mortimer, Middle Earth, SMFD, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, Schroeder, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from engaging in any conduct or making any

statement suggesting that Plaintiffs' customers may or should stop making payments to Plaintiffs;

iii.   Enjoining Miller, Miller Law, Saliba, Molfetta, Molfetta Law, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from stating or suggesting that Plaintiffs' customers may or should stop making payments to Plaintiffs without establishing an attorney-client relationship with the customer, investigating the customer's factual circumstances, and explaining the potential risks of default to the customer; and

iv.   Requiring Defendants to provide notice of such injunction by posting the Order on the websites they use or control and any websites which refer to and/or link to the websites they use or control.

(b) Judgment against Defendants for monetary damages, consisting of:

i.   The unpaid and due promissory note obligations and balances on the Diamond Owners' accounts with Plaintiffs;

ii.   Punitive damages; and

iii.   Costs incurred in this action.

## <u>COUNT IV</u>
## VIOLATION OF FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT, FLA. STAT. CH. 501

130.   Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 86 above as if more fully set forth herein.

131.   This is a cause of action for violations of the Florida Deceptive & Unfair Trade Practices Act, Fla Stat. Ch. 501 ("FDUTPA"), against all Defendants.

132.   Plaintiffs each are an "interested party or person" as defined by FDUTPA § 501.203(6).

133.   Defendants are engaged in "trade or commerce" as defined by FDUTPA § 501.203(8).

134.   Defendants actions, as described above, including but not limited to their false and misleading advertisements and solicitations, and the conduct of their business activities, constitute "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of FDUTPA § 501.204(1).

135.   FDUTPA § 501.203(3) also defines a "violation of this part" – which triggers remedies under FDUTPA § 501.211 – to include Federal Trade Commission rules and "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."

(a) Defendants' businesses meet the definition of a "credit repair organization" under the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3).  However, Defendants improperly collect fees in advance in violation of 15 U.S.C. § 1679b(b) and they use untrue or misleading representations to, and commit or attempt to commit fraud and deception on, consumers and Plaintiffs in violation of 15 U.S.C. § 1679b(a).

(b) Timeshare Freedom Group, Systema, Salkin, and Schroeder meet the definition of a "credit services organization" under California law, Cal. Civ. Code § 1789.12(a). However, Timeshare Freedom Group, Systema, Salkin, and Schroeder charge an advance fee in violation of Cal. Civ. Code § 1789.13(a), make or use false or misleading representations in violation of Cal. Civ. Code § 1789.13(g), and engage or cause others to engage in fraudulent or deceptive acts in violation of Cal. Civ.

Code § 1789.13(h).

(c) Mortimer meets the definition of a "credit services organization" under Missouri law, Mo. Stat. § 407.637-1.  However, Mortimer charges an advance fee in violation of Mo. Stat. § 407.638(1), makes or uses false or misleading representations in violation of Mo. Stat. § 407.638(3), engages or causes others to engage in fraudulent or deceptive acts in violation of Mo. Stat. § 407.638(4), and makes or causes others to make false or misleading statements to Plaintiffs in connection with customer's debts in violation of Mo. Stat. § 407.638(5).

(d) Mortimer, Miller, Miller Law, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law meet the definition of a "credit service organization" under Florida law, Fla. Stat. § 817.7001(2), as they engage in the credit service business on a regular and continuing basis.  However, these Defendants charge an advance fee in violation of Fla. Stat. § 817.7005(1); make, or counsel or advice customers to make, statements that should be known to be false or misleading in violation of Fla. Stat. § 817.7005(3); make or counsel or advice customers to omit material facts to consumer reporting agencies or to Plaintiffs in violation of Fla. Stat § 817.7005(3); make or use false or misleading representations in violation of Fla. Stat. § 817.7005(4); and operate as a fraud or deception on any person in connection with services offered in violation of Fla. Stat. § 817.7005(4).

(e) Mortimer, Saliba, Timeshare Freedom Group, Systema, Salkin, and Schroeder are engaged in "debt management services" under Florida law, Fla. Stat. § 817.801(4). However, these Defendants charge advance and excessive fees in violation of Fla. Stat. § 817.802.

(f) Each of these statutes, laws, rules, and regulations define and prohibit conduct that is unfair, deceptive, or unconscionable, and that conduct therefore constitutes a violation of FDUTPA.[6]

136.   Defendants' conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers and businesses alike.

137.   Defendants knew or should have known that their conduct was unfair competition, unconscionable, or unfair or deceptive.

138.   Defendants' conduct is ongoing, and Defendants are continuing to violate FDUTPA, as described above.

139.   Defendants' conduct has caused harm to consumers, including but not limited to, (1) causing consumers to pay Defendants for services that are not rendered and never could be rendered, and (2) causing consumers to experience adverse consequences in connection with hiring Defendants and defaulting on obligations to Plaintiffs, including an inability to communicate with and negotiate with Plaintiffs to resolve any account-related issues, negative credit reporting, foreclosure, and adverse judgments.

140.   Plaintiffs have suffered losses as a result of Defendants' violations of FDUTPA and are entitled to recover their actual damages, attorney's fees, and court costs under FDUTPA § 501.211(2).

141.   Plaintiffs are aggrieved by Defendants' violations of FDUTPA and are entitled to a declaratory judgment that Defendants' acts or practices violate FDUTPA and an injunction to

---

[6] Plaintiffs are not asserting causes of action under the statutes referenced herein.  Instead, Plaintiffs allege that the specified Defendants engaged in conduct prohibited by the referenced statutes, which constitutes a violation of FDUTPA for which Plaintiffs assert causes of action.  As they further investigate Defendants' scheme, Plaintiffs anticipate discovering additional violations of statutes which also constitute a violation of FDUTPA.

enjoin Defendants, who have violated, are violating, or are otherwise likely to violate FDUTPA under FDUTPA § 501.211(1).

142.    By this action, Plaintiffs seeks the following relief:

(a) Injunctive Relief, including:

i.   Enjoining Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from violating FDUTPA, and from violating FDUTPA in the specific manner identified above;

ii.  Requiring Defendants to remove from the public domain, wherever possible, and to destroy, all false, misleading, deceptive and unfair materials;

iii. Requiring Defendants to file with this Court and serve on Plaintiffs within fifteen days after entry of an injunction, a report, in writing and under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction; and

iv.  Requiring Defendants to provide notice of such injunction by posting the Order on the websites they use or control and any websites which refer to and/or link to the websites they use or control.

(b) Judgment against Defendants for monetary damages, consisting of:

i.   Actual damages consisting of the unpaid and due promissory note obligations and balances on the Diamond Owners' accounts with Plaintiffs;

ii.  Punitive damages; and

iii. Attorney's fees and costs incurred in this action.

## COUNT V
## CIVIL CONSPIRACY

143.     Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 85 above as if more fully set forth herein.

144.     This is a cause of action for civil conspiracy to commit tortious interference, and is within the Court's supplemental and diversity jurisdiction.

145.     Miller, Miller Law, Mortimer, Middle Earth, SMFD, Saliba, Silva, Systema, Salkin, Schroeder, Molfetta, and Molfetta Law are parties to a civil conspiracy as they conspired to commit an unlawful act—tortious interference—or conspired to commit some lawful act using unlawful means.

146.     Defendants each performed one or more overt acts in furtherance of their conspiracy, including but not limited to:

> (a) The Marketing Defendants utilize false and misleading advertising, promotion, and solicitation and engage in deceptive and unfair practices, as set forth above, to make contact with Plaintiffs' customers;

> (b) Miller, Miller Law, Saliba, Molfetta, and Molfetta Law knowingly participate in, contribute to, and facilitate the Marketing Defendants' misconduct by purporting to provide the services falsely and misleadingly represented by the Marketing Defendants, to wit, a "legal process" to cancel timeshare contracts;

> (c) Defendants engage in deceptive and unfair practices to induce the Diamond Owners to stop making payments to Plaintiffs, and do so on a cooperative basis;

> (d) Defendants engage in deceptive and unfair practices to conceal from the Diamond Owners that the so-called "legal process" for timeshare cancellation service was, in fact, causing the Diamond Owners to default, and do so on a cooperative basis;

(e) Defendants engage in deceptive and unfair practices to convince Plaintiffs' customers that their contracts were cancelled as a result of Defendants' actions, as opposed to default, and doing so on a cooperative basis; and

(f) Defendants shift responsibility between them to avoid issuance of refunds.

147. The purpose of the conspiracy between Defendants is to enrich themselves, including through collection of fees from the Diamond Owners that were paid to Defendants instead of Plaintiffs for legally-enforceable contractual obligations.

148. Defendants did not have any privilege or justification to interfere with Plaintiffs' contracts.

149. As a direct and proximate result of the foregoing, Plaintiffs suffered damages arising from the non-payment of legally-enforceable contractual obligations by their customers identified in Exhibit A, and destruction of Plaintiffs' relationships with their customers.

150. Defendants are actively and continuously operating in this manner, attempting to— and in some cases succeeding in—interfering with Plaintiffs' contracts and business relationships. Defendants' actions present an immediate threat of harm to Plaintiffs, Plaintiffs' customers, and their relationships. Plaintiffs will also suffer irreparable harm from the destruction of their relationships with their customers caused by Defendants' actions, for which there is no adequate remedy. Thus, injunctive relief is warranted to enjoin Defendants' actions as described herein.

151. There would be no legitimate harm to Defendants from entry of the requested injunction, as they would merely be enjoined from performing unlawful acts. The issuance of the requested injunction would also serve the public interest by protecting consumers from Defendants' unlawful conduct and by protecting Plaintiffs' legitimate business interests.

152. By this action, Plaintiffs seek the following relief:

(a) Injunctive Relief, including:

    i. Enjoining Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from tortiously interfering with Plaintiffs' contracts;

    ii. Enjoining Mortimer, Middle Earth, SMFD, Saliba, Silva, Timeshare Freedom Group, Systema, Salkin, Schroeder, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from engaging in any conduct or making any statement suggesting that Plaintiffs' customers may or should stop making payments to Plaintiffs;

    iii. Enjoining Miller, Miller Law, Saliba, Molfetta, Molfetta Law, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from stating or suggesting that Plaintiffs' customers may or should stop making payments to Plaintiffs without establishing an attorney-client relationship with the customer, investigating the customer's factual circumstances, and explaining the potential risks of default to the customer; and

    iv. Requiring Defendants to provide notice of such injunction by posting the Order on the websites they use or control and any websites which refer to and/or link to the websites they use or control.

(b) Judgment against Defendants for monetary damages, consisting of:

    i. The unpaid and due promissory note obligations and balances on the Diamond Owners' accounts with Plaintiffs;

ii.   Punitive damages; and

iii.   Costs incurred in this action.

**JURY DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: September 10, 2020.                    GREENSPOON MARDER LLP


By:      */s/ Richard Epstein*
Richard W. Epstein
Florida Bar No. 229091
richard.epstein@gmlaw.com
maria.salgado@gmlaw.com
Jeffrey A. Backman
Florida Bar No. 662501
jeffrey.backman@gmlaw.com
khia.joseph@gmlaw.com
Julia Stepanova
Florida Bar No. 1021185
julia.stepanova@gmlaw.com
lajoi.thompson@gmlaw.com
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Telephone: 954.491.1120
Facsimile:  954.343.6958

*Counsel for Plaintiffs*